UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

EDITH COULTER, individually and
as assignee of VICTOR LEE HUSZAGH,

     Plaintiff,

v.                               CASE NO. 4:12-cv-00577-WS/CAS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY

     Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendant, State Farm Mutual Automobile Insurance Company ("State Farm"), pursuant to Federal Rule of Civil Procedure 56, and N.D. Fla. Loc. R. 56.1, hereby respectfully files this Motion for Summary Judgment and Incorporated Memorandum of Law.  Pursuant to N.D. Fla. Loc. R. 56.1(A), State Farm's Concise Statement of Material Facts as to which there is no genuine issue to be tried has been filed separately. The material facts are not in dispute, and Plaintiff is not entitled to any recovery from State Farm as a matter of law.

## OVERVIEW

The current action for common law bad faith stems from the underlying bodily injury ("BI") claim[1] Edith Coulter ("Coulter") asserted against State Farm's insured, Victor Lee Huszagh ("Huszagh").  Coulter's BI claim stems from an automobile accident on March 20, 2009 between Coulter and Huszagh wherein Coulter was injured. State Farm insured Huszagh

---

[1] Coulter's property damage claim was handled separately.  Coulter submitted that claim to her automobile insurer, Progressive, who then subrogated against State Farm. State Farm's handling of Coulter's property damage claim is not at issue in this bad faith action.

under an automobile insurance policy with $50,000 bodily injury liability limits.  The relevant facts are largely undisputed and demonstrate State Farm exercised diligence and care in its investigation and evaluation of Coulter's BI claim, attempted in good faith to settle Coulter's claim for Huszagh's BI limit, and fulfilled its good faith obligations to advise Huszagh of settlement opportunities, of the probable outcome of litigation, of the possibility of an excess judgment and of steps he may take to avoid an excess judgment.  Within a week of the accident, State Farm promptly notified Coulter that Huzagh had $50,000 in BI limits and within eleven (11) days of the accident, State Farm offered and tendered the $50,000 BI limit to Coulter to settle her claim and secure a release of Huszagh.  Later, State Farm timely provided insurance information to Coulter's Counsel and attempted in good faith to provide additional items her Counsel requested. State Farm attempted for over six (6) months to pay its limits to settle Coulter's claim and secure a release of its insured, offering and tendering the BI limits on three (3) separate occasions. Despite State Farm's good faith attempts to settle, Coulter and her Counsel arbitrarily foreclosed negotiations before settlement could be finalized and refused to accept Huszagh's BI limits to settle her claim.  State Farm did not unreasonably or wrongfully delay settlement nor seek to avoid settlement, and at no time did it act in its own self-interest and without due regard for its insured's interest.

Ultimately, Coulter and Huszagh entered into a settlement and assignment agreement, which resulted in entry of a $2,000,000 consent judgment in favor of Coulter and against Huszagh.  On October 31, 2012, Plaintiff filed the instant lawsuit against State Farm for common law bad faith, alleging State Farm acted in bad faith for not settling the Plaintiff's claim against Mr. Huszagh within policy limits when it could and should have done so, having been given the

opportunity to do so (Doc. 1, ¶30).  However, the undisputed facts show State Farm attempted in good faith to settle the subject claim for Huszagh's policy limit, all the while keeping Huszagh fully advised of settlement opportunities, of the potential for excess exposure and of the steps he could take to avoid an excess judgment. There is no evidence State Farm put its own interests ahead of Huszagh's or that its conduct rose to the level of bad faith actionable at Florida law. Therefore, summary judgment in State Farm's favor should be granted as no reasonable jury could conclude that State Farm acted in bad faith towards its insured in attempting to settle Coulter's claim and obtain a release for him.

## MEMORANDUM OF LAW

### A.   Florida Substantive Law Applies

When exercising jurisdiction on the basis of diversity, a federal court must apply the substantive law of the state in which it sits. See Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938). Florida law controls the present action for bad faith.

### B.   The Law of Good Faith in Florida

Florida common law provides that insurers owe "a duty to their insureds to refrain from acting solely on the basis of their own interests in settlement," otherwise known as the duty of "good faith."  State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 58 (Fla. 1995);  see also Johnson v. Geico General Ins. Co., 318 Fed. Appx. 847 (11th Cir. 2009)("[t]he essence of an insurance bad faith claim is that the insurer acted in its own best interests to the detriment of the insured") (citing Macola v. Government Employees Ins. Co., 953 So.2d 451, 458 (Fla. 2006)). The "good faith" standard obligates an insurer to use the same degree of care and diligence to settle a claim as would a reasonably prudent person faced with the prospect of paying the total

3

recovery. <u>Boston Old Colony Ins. Co. v. Gutierrez</u>, 386 So.2d 783, 785 (Fla. 1980).   The

standard arises out of the insurer's fiduciary relationship with the insured, and because of that

relationship, "the insurer thus owes a duty to the insured to refrain from acting solely on the basis

of the insurer's own best interest in considering a settlement." <u>Maldonado v. First Liberty Ins.</u>

<u>Corp.</u>, 546 F.Supp.2d 1347, 1353 (S.D. Fla. 2008), aff'd, 342 Fed. Appx 485 (11th Cir. 2009).

An insurer's duty of good faith to its insured requires the insurer to:

> [A]dvise the insureds of settlement opportunities, to advise as to the probable
> outcome of the litigation, to warn of the possibility of an excess judgment, and to
> advise the insured of any steps he might take to avoid same.  The insurer must
> investigate the facts, give fair consideration to a settlement offer that is not
> unreasonable under the facts, and settle, if  possible, where a reasonably prudent
> person, faced with the prospect of paying the total  recovery, would do so.

<u>Gutierrez</u>, 386 So.2d at 785.   The  duty of good  faith also obligates  an insurer to initiate

settlement negotiations "[w]here liability is clear, and [the] injuries so serious that a judgment in

excess of the policy limits is likely…" <u>Powell v. Prudential Property & Casualty Ins. Co.</u>, 584

So.2d 12, 14 (Fla. 3d DCA 1991).

 Florida law applies a "totality of the circumstance" standard when evaluating bad faith

actions.  <u>See</u> <u>Berges v. Infinity Ins. Co.</u>, 896 So.2d 665, 680 (Fla. 2004); <u>Laforet</u>, 658 So.2d at

63. More specifically, the issue to be determined is whether under all the circumstances the

insurer could and should have settled the claim within the policy limits had it acted fairly and

honestly towards its insured and with due regard for his interests. <u>Berges</u>, 896 So.2d at 687.

Mistakes and miscues by the insurer do not meet this standard. <u>Id</u>.   Florida law dictates that bad

faith is more than mere negligence. <u>See</u> <u>Campbell v. Government Employees Ins. Co.</u>, 306 So.

2d 525, 530-531 (Fla. 1974) (citing <u>Auto Mutual Indemnity Co. v. Shaw</u>, 184 So. 852, 859 (Fla.

1938)); <u>Cardenas v. Geico Cas. Co.</u>, 760 F.Supp.2d 1305 (M.D. Fla. 2011) ("negligent conduct

(without more) falls short of bad faith"); DeLaune v. Liberty Mut. Ins. Co., 314 So. 2d 601, 603 (Fla. 4th DCA 1975) ("a cause of action based solely on negligence which does not rise to the level of bad faith does not lie."); Travelers Indem. Co. of Ill. v. Royal Oak Enterprises, Inc., 429 F.Supp.2d 1265 (M.D. Fla. 2004) (under Florida law, refusal to settle a claim must be premised on bad faith, not negligence). While negligence is a factor that the court may consider when determining whether an insurer acted in bad faith, an insurer who is negligent in its handling of an insured's claim but whose actions do not rise to the level of bad faith cannot be held liable for an excess judgment. Barnard v. Geico General Insurance Co., 448 Fed. Appx. 940, 944 (11th Cir. 2011) (noting insurer's "negligent oversight" does not amount to bad faith); Campbell, 306 So. 2d at 530-531(confirming that the standard in Florida for determining liability in an excess judgment case is bad faith rather than negligence); DeLaune, 314 So. 2d at 602-603 (noting an action for bad faith does not lie if based on negligent conduct that does not rise to the level of bad faith). "Thus, insurers have a positive duty to handle claims in a way that protects the interests of their insured, but they are not required to handle them perfectly, nor must they act without having had sufficient time to process and investigate a claim." Novoa v. GEICO, No. 12-80223-CV, 2013 WL 172913 at *4 (S.D. Fla. January 16, 2013).

The factors which courts should consider when determining whether, under the totality of circumstances, an insurer acted in bad faith will differ depending on the facts of each case. Berges; Williams v. Infinity Ins. Co., 745 So.2d 573 (Fla. 5th DCA 1999). Although a bad faith claim derives from and emphasizes the duty of the insurer to the insured when considering the totality of the circumstances, the conduct of a claimant and the claimant's attorney, including the claimant's unwillingness to settle, is relevant to determining the "realistic possibility of

5

settlement." <u>Cardenas v. Geico Cas. Co.</u>, 760 F.Supp.2d 1305, 1309 (M.D. Fla. 2011) (quoting <u>Barry v. Geico Gen. Ins. Co.</u>, 938 So. 2d 613, 618 (Fla. 4th DCA 2006)).

### C.   **Summary Judgment in Bad Faith Actions**

In general, summary judgment is appropriate when the movant can demonstrate that there is no genuine issue of material fact and is entitled to judgment as a matter of law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986); Fed.R.Civ.P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celetox</u>, 477 U.S. at 322. The moving party bears the initial responsibility of demonstrating that there is no genuine issue of material fact. <u>Id.</u> at 323.  An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S.  at 248, 106 S.Ct. at 2510. Factual disputes that are irrelevant or unnecessary will not preclude the entry of summary judgment. <u>Id.</u>

While the issue of whether an insurer's conduct rises to the level of bad faith is ordinarily a jury question, "Florida courts have endorsed judgment as a matter of law in cases where the undisputed facts would not support the conclusion that the insurer acted in bad faith." <u>Barnard</u> 448 Fed. Appx. at 943; <u>see also</u> <u>Johnson</u> 318 Fed. Appx. at 850 (finding that "Florida appellate courts have affirmed summary judgment [if] the undisputed facts would allow no reasonable jury

to conclude the defendant acted in bad faith."); Keifer v. Government Employees Ins. Co., Case No. 3:00-cv-132/LAC, *7 (N.D. Fla. Sep. 11, 2001), aff'd case no. 01-15545, 2002 WL 34924509 (11th Cir. May 7, 2002) ("Florida appellate courts have affirmed summary judgment where the undisputed facts would allow no reasonable jury to conclude the defendant acted in bad faith."); Caldwell v. Allstate Ins. Co., 453 So.2d 1187, 1190 (Fla. 1st DCA 1984) (affirming finding of no bad faith as a matter of law as "it cannot reasonably be said that [insurer] or its counsel was guilty of the kind of conduct" courts have typified as bad faith).

Where there is no evidence from which a jury could find that the insurer acted in bad faith, summary judgment in the insurer's favor is proper. Shin Crest PTE, Ltd. v. AIU Ins. Co., 368 Fed. Appx. 14 (11th Cir. 2010) (affirming district court order granting summary judgment as facts show insurer fulfilled the good faith duty owed its insured by attempting, albeit unsuccessfully, to obtain for the insured a release from liability); Maldonado, 342 Fed. Appx. 485 (affirming district court order granting summary judgment as evidence of bad faith was utterly lacking where insurer twice offered to settle within the policy limits, conditioned on a release of its insured, and appropriately communicated with its insured). "A bad faith action is susceptible to summary judgment [in favor of the insurer] if the plaintiff lacks sufficient evidence of bad faith." Cardenas, 760 F.Supp.2d at 1309 (summary judgment granted for an insurer because facts demonstrated insurer acted promptly, diligently and with due concern for insured's best interest). See also Barnard 448 Fed. Appx. at 943-944 (summary judgment appropriate where insurer tendered limits just eleven days after the accident and worked diligently to pursue settlement but could not finalize settlement due, in part, to claimant counsel's inexplicable evasive behavior); Aboy v. State Farm Mut. Auto. Ins. Co., 394 Fed.

Appx. 655, 656–57 (11th Cir. 2010) (affirming summary judgment and finding that delay of seven (7) months from when the insurer learned of the claim to when it offered to pay policy limits was not bad faith, where insurer requested claimant cooperate by providing a signed medical authorization form and where claimant ignored the insurer's request); <u>RLI Ins. Co. v. Scottsdale Ins. Co.</u>, 691 So.2d 1095, 1096 (Fla. 4th DCA 1997) (finding that facts showed "beyond any doubt that the primary insurer at no time missed an opportunity to settle which would have put it in a bad faith posture"); <u>Clauss v. Fortune Insurance Co.</u>, 523 So.2d 1177, 1178 (Fla. 5th DCA 1988) (finding of no bad faith as a matter of law where insurer tendered policy limits one month after initial policy limits demand and expressed during the demand period its willingness to tender the policy limits but first desired to verify the claim); <u>Williams v. GEICO Gen. Ins. Co.</u>, 143 Fed. Appx. 275, 276 (11th Cir. 2005) ("there is insufficient record evidence that would lead a rational trier of fact to conclude that insurer acted in bad faith" in handling the claim).

### D. <u>State Farm Fulfilled the Good Faith Duties it Owed Huszagh</u>

Summary Judgment in State Farm's favor should be granted as Coulter lacks sufficient evidence of bad faith and no reasonable jury could conclude State Farm acted in its own best interest and in disregard for its insured's interest. The relevant facts are largely undisputed and demonstrate State Farm exercised diligence and care in its investigation and evaluation of Coulter's claim, attempted in good faith to settle Coulter's claim for Huszagh's policy limit, and advised its insured of settlement opportunities, of the probable outcome of litigation, of the possibility of an excess judgment and of steps he may take to avoid same. The undisputed facts further demonstrate State Farm promptly notified Coulter of the available BI limits and timely

provided insurance information to Coulter's Counsel. Moreover, State Farm repeatedly tendered Huszagh's BI limits to Coulter in exchange for a release of Huszagh.  The first of these tenders occurred within eleven (11) days of the accident (CSMF ¶9).  State Farm expended every effort to promptly provide Coulter with requested information and expressed a willingness to negotiate in good faith with Coulter, but Coulter rejected State Farm's tenders and refused to settle her BI claim for Huszagh's BI limits. The undisputed facts demonstrate Coulter, not State Farm, frustrated the opportunity for settlement. There is no evidence demonstrating State Farm unreasonably or wrongfully delayed settlement or that it sought to avoid settlement.  At no time did State Farm act in its own self-interest and without due regard for its insured's interest.

September 14, 2009 is the date on which Coulter rejected State Farm's limits tender, terminated further settlement negotiations for policy limits and filed suit against Huszagh (CSMF ¶36). No subsequent opportunity to settle for policy limits was presented to State Farm. Accordingly, the purported bad faith conduct at issue is State Farm's claim handling from the date of the accident up to September 14, 2009, the date Coulter rejected State Farm's policy limits tender and advised State Farm that settlement for Huszagh's BI limits would not happen. State Farm's handling of Coulter's claim and State Farm's arguments in support of its contention that its actions do not rise to the level of bad faith as a matter of law follow.

State Farm's investigation of Coulter's claim commenced on Saturday March 21, 2009, the same day it learned of the accident (CSMF ¶5). Within three (3) days of the accident, management had reviewed the claim and claim representatives had placed repeated calls to Coulter and Huszagh, conducted a scene investigation, secured a police report, interviewed Huszagh, and explained available liability coverages to both Huszagh and to Coulter's next-of-

kin. State Farm responded without delay to inform Huszagh, among other matters, of BI handling and the limits of his BI coverage, of the possibility of exposure in excess of his policy limits and of his right to retain an attorney to represent his interest (CSMF ¶¶6, 7, 10).

Within six (6) days of the accident, State Farm authorized payment of Huszagh's $50,000 BI limits to settle Coulter's BI claim and within seven (7) days of the accident, State Farm had provided Coulter's next-of-kin with written confirmation of the BI limits available under Huszagh's policy. Eleven (11) days after the accident, State Farm took the initiative to discuss settlement with Coulter and sent her a $50,000 settlement draft, representing the policy's full BI limits, along with a proposed release of Huszagh. State Farm's draft was made payable to Coulter and Tallahassee Memorial Hospital ("TMH") as it believed TMH was a lien hospital. With its tender, State Farm confirmed in writing once more that Huszagh's policy had BI limits of $50,000. State Farm gave Huszagh a copy of this tender letter, apprising him of the steps undertaken to secure a release for him (CSMF ¶9).

Over the next four (4) months, State Farm attempted to follow up with Coulter and her next-of-kin, seeking to finalize settlement for the full BI limits and offering to answer any questions Coulter may have. Between March 21, 2009 and August 4, 2009, State Farm phoned and wrote Coulter (and her next-of-kin) no less than twelve (12) times, but was never able to speak directly with Coulter (CSMF ¶¶11, 13, 14, 16, 17, 19, 21). In July 2009, State Farm re-tendered the BI limits to Coulter, correcting payee information on the draft. With this tender, like the one made in March 2009, State Farm enclosed a proposed standard form of release, releasing Huszagh from further liability. As with its earlier tender, State Farm advised Coulter that payment of limits was conditioned on her releasing Huszagh, but not conditioned on her

10

signing this particular form of release.  With both tenders, State Farm expressed a willingness to work with Coulter to arrive at agreeable release language and to discuss settlement with her (CSMF ¶17).  In the months following the accident, State Farm spoke and wrote to Huszagh, keeping him apprised of its claims handling (CSMF ¶10).  No bad faith can be inferred from these actions.

Coulter, represented since April 2009 and perhaps earlier, did not respond to State Farm's offers, tenders and overtures of settlement until mid-August 2009 (CSMF ¶¶8, 22, 23).  By letter dated August 11, 2009, Coulter's attorney, Mr. Marino ("Marino"), responded to State Farm's settlement overtures and made some requests of State Farm, stating once the items were "in hand" then Coulter would release Huszagh. Specifically, Marino asked State Farm to comply with F.S. §627.4137 within the time afforded by the statute. Marino also asked Claim Representative Shannahan ("CR Shannahan") to give a summary of statements Bradley Coulter had made to her.  Marino also stated Huszagh left Coulter a voice mail message apologizing for the accident and suggested Huszagh, therefore, "should be amenable" to providing an affidavit confirming he had no other insurance coverage that would pay for Coulter's losses.  He asked State Farm to re-issue the settlement draft payable to Coulter and his firm, giving assurances he would take care of all liens (CSMF ¶23).

CR Shannahan did not receive Marino's August 11 letter until August 26, 2009, 15 days after the date on the letter's face (CSMF ¶22).  The reason CR Shannahan did not receive the letter until August 26, 2009 is not known by either party.  But, upon its receipt, CR Shannahan acted with dispatch in collecting the items requested. The same day she received the letter, CR Shannahan made a priority request for a BI disclosure response and for a search to be conducted

for other household policies. Claim Service Assistant Cindy Cannon requested the policy's declarations page. CR Shannahan called Marino's office and asked about the form of affidavit he wanted from Huszagh.  Next she called Huszagh and reviewed the August 11 letter with him and informed him of the message she left at Marino's office asking about the form of affidavit and release Marino wanted used. CR Shannahan asked Huszagh about other insurance coverage.  He did not have any (CSMF ¶24).

On August 27, 2009, Huszagh sent an email to Marino stating he had no other liability or umbrella coverage or any other insurance apart from State Farm's policy with $50,000 BI limits. He agreed to execute any affidavit showing the State Farm policy with $50,000 BI limits was the only coverage available to him and he provided his address so Marino could send him an affidavit (CSMF ¶25).

On August 28, 2009, State Farm tendered Huszagh's $50,000 BI limits a third time in a draft made payable to Coulter and her lawyers.  With this tender, State Farm provided a proposed release for Coulter's consideration.  This proposed release was identical in form to the two others State Farm had previously sent Coulter.  In her letter transmitting the draft and release, CR Shannahan provided Marino with a summary of the information she obtained from her discussions with Bradley Coutler. She acknowledged and recounted Marino's comments regarding the affidavit of Huszagh and asked Marino to forward the form of affidavit and release he wanted used.  CR Shannahan sent Huszagh a copy of this letter, apprising him in writing of the items Marino requested and of the steps taken by State Farm thus far to provide those items (CSMF ¶26).

On August 31, 2009, State Farm finalized its response to the request for insurance information pursuant to §627.4137, Fla. Stat. (2009), and provided information and documents in compliance with the statute, to wit: a sworn statement[2] from a State Farm claims manager as to the insurance policies known to State Farm, including the name of the insured and limits of available coverage, along with a copy of the policy inclusive of the declarations page and policy endorsements (CSMF ¶¶28, 29, 30, 31).

By letter dated September 4, 2009, Marino responded to CR Shannahan's inquiry (made eight days earlier on August 28) regarding Huszagh's affidavit and refused to provide a form for Huszagh's use (CSMF ¶32).  CR Shannahan received Marino's response on September 8, 2009[3], the next business day after it was sent, and immediately contacted Jacksonville attorney, Dwane Tyson ("Tyson") asking him to help draft an affidavit for Huszagh's use (CSMF ¶33).  The following day, after discussing the matter with Tyson, she faxed Marino's letters to him and on September 11, 2009, Tyson forwarded an "Affidavit of No Other Insurance" for Huzsagh's use. The affidavit confirmed Huszagh had no other liability coverage with regard to the accident apart from the State Farm policy with $50,000 BI limits.  Once she received the affidavit from Tyson, CR Shannahan called Huszagh, reviewed Marino's letter with him, and faxed him the proposed affidavit with instructions that he execute if correct, then mail the original to Plaintiff's attorney and provide a fax copy to State Farm. That afternoon, Huszagh reviewed the affidavit, found it to be correct in form and content, and signed it in the presence of a notary swearing it to be a true

---

[2] State Farm provided its verified statement of insurance, limits, coverage defenses, other known insurers and copy of the policy through a declaration under penalty of perjury in accordance with F.S. §95.525.

[3] The letter was sent by fax and mail on Friday, September 4, 2009.  Monday September 7, 2009 was Labor Day.

and accurate statement as to the coverages available to him.  He faxed a copy to CR Shannahan and gave the original to his secretary to mail (CSMF ¶34).  Huszagh confirmed to State Farm that his secretary mailed it on September 12, 2009 (CSMF ¶35).  Huszagh's affidavit was received at Marino's office no later than September 15, 2009[4] (CSMF ¶38).   No bad faith can be inferred from these actions.

Despite State Farm's good faith attempts to settle Coulter's claims, it was  unable to so as Coulter and Coulter's Counsel arbitrarily and capriciously foreclosed settlement negotiations on Monday, September 14, 2009, rejecting State Farm's tender and giving contrived reasons for so doing. The evidence demonstrates State Farm expended every effort to promptly provide Marino with the information and items requested, and no bad faith can be inferred from State Farm's actions.  From the beginning, State Farm stood ready to settle the claim and repeatedly tendered its policy limits.  State Farm was unable to culminate settlement as Coulter and her attorney, not State Farm, frustrated settlement.  Though "a bad faith claim derives and emphasizes the duty of the insurer to the insured, the conduct of a claimant and the claimant's attorney is relevant to determining the 'realistic possibility of settlement.' " Cardenas at 1309 (quoting Barry v. Geico Gen. Ins. Co., 938 So.2d 613, 618 (Fla. 4th DCA 2006)).  Additionally, Coulter must do more than demonstrate the claim could have but did not settle for policy limits and must demonstrate more than negligence on the part of State Farm. Id.; see also Barnard, 2011 WL 2039560 (N.D. Fla. 2011)("[n]egligent conduct, without more, falls short of 'bad faith'). When, as here, the

---

[4] September 15, 2009 is the date someone at Marino's office scanned the affidavit into their records.

insurer fulfilled the duty to the insured by attempting, albeit unsuccessfully, to obtain for the insured a release from liability, summary judgment should be entered in its favor.

Plaintiff contends State Farm's failure to give "mirror-image" responses to Coulter's requests before she ended settlement discussions constitutes bad faith. That State Farm may not have given "mirror-image" responses to Coulter's requests before she arbitrarily foreclosed further settlement discussions does not equate to bad faith conduct. <u>See</u> <u>Cardenas</u> (insurer's failure to provide "mirror-image" acceptance of time-sensitive conditional demand did not equate to bad faith where insurer acted promptly and diligently tried to comply with each condition). As the evidence clearly shows, State Farm acted diligently and with due concern for Huszagh's interest in its efforts to provide the information Coulter requested, and expressed a willingness to work with Coulter and Marino to arrive at agreeable release and affidavit language and to answer any coverage or limits questions they had.

Specifically, Plaintiff contends State Farm acted in bad faith because it failed to provide Huszagh's affidavit to Marino on or before September 10, 2009. Notably, Marino never advised State Farm that Huszagh's affidavit must be supplied by September 10, 2009, nor that the failure to provide it by that time would foreclose forever State Farm's ability to settle Coulter's claims for policy limits. Marino simply stated "[Huszagh] left [Coulter] a voicemail expressing his sympathies…and should therefore be amenable to executing an affidavit confirming that he has no additional insurance coverage that could be used to pay for the losses that he caused" (CSMF ¶23). Notwithstanding, Plaintiff contends Marino's August 11 letter "implied" that all items mentioned therein, not just State Farm's insurance disclosure in compliance with F.S. §627.4137, had to be "in hand" within 30 days of the letter's date or else no settlement for limits could be

had.  Of importance, Plaintiff misconstrues the time requirements imposed by F.S. §627.4137.

Contrary to Plaintiff's contention, the statute affords an insurer 30 days from the date it receives

the claimant's written request to supply the information to the claimant.  See Section 627.4137,

Fla. Stat. (2009).

Despite Marino's failure to specify when the affidavit must be *"in hand"* the evidence

establishes Huszagh sent Marino the affidavit within 30 days of the date State Farm received the

August 11th letter.  Notably, Marino's office purportedly sent the August 11th letter by certified

mail but not until August 12, 2009 (per the postmark on the outgoing certified mail

documentation)(CSMF ¶23).  It is important to note that return receipt documentation for the

letter, verifying it was sent by certified mail and evidencing who at State Farm signed for the

letter or the date he or she signed for it, had not been located.  If mailed from Marino's Miami

office on August 12, 2009 (and not later), then the letter could not feasibly have arrived at State

Farm before August 13, 2009.  Indeed, it is more likely that the letter took three (3) days, as did

Marino's September 14 rejection letter[5], to arrive by certified mail at State Farm.  Huszagh's

affidavit was supplied on September 12, 2009, the date Huszagh's office mailed it, which is

within 30 days of the date State Farm received Marino's letter asking about the affidavit.

Marino never conditioned acceptance of limits on his receipt of Huszagh's affidavit by a

specified date, much less by September 10, 2009, and no reasonable jury could conclude State

Farm acted in bad faith given the total circumstances.  Recall, CR Shannahan did not receive the

---

[5] Marino's September 14, 2009 rejection letter was sent by fax and certified mail. The certified mail return receipt for that letter has been located and preserved by Marino's office.  The documentation reflects the letter was mailed from Marino's office on September 14, 2009 and received and signed for at State Farm three (3) days later on September 17, 2009.

request until August 26, 2011, and she acted without delay to tell Huszagh about it and to ask Marino if he would provide a form for Huszagh to use.  The failure to provide the affidavit any sooner than Huszagh did was not due to Huszagh's or State Farm's desire to avoid or unduly delay settlement.   No reasonable jury could conclude that sending the affidavit by September 12, 2009 (within 30 days of the earliest date State Farm could have received the request) was unreasonable or that it was a condition of settlement that was not timely met.   Additionally, no reasonable jury could conclude, even if State Farm had a role in the delay getting the August 11 letter to CR Shannahan, that there is bad faith.  See Keifer, 2002 WL 34924509 at *1-2 (finding no reasonable jury could conclude insurer who missed demand deadline due to delays known, but not fixed,  in insurer's mailroom caused demand package deadline to be missed and settlement opportunity for limits to be lost).

Plaintiff also contends State Farm acted in bad faith because the form of affidavit Huszagh signed and submitted was purportedly deficient (CSMF ¶¶24, 25).  Both State Farm and Huszagh asked Marino, to no avail, to supply the form of affidavit he wanted.  Thereafter, State Farm enlisted Jacksonville attorney Dwane Tyson to help prepare a suitable affidavit.  Huszagh, a practicing attorney since 1969, was asked to review the affidavit Tyson prepared and execute it only if correct[6].  Huszagh reviewed the affidavit, found it to be correct in both content and form, and signed it in the presence of a notary, swearing it to be a true and accurate statement as to the coverages  available  to  him  (CSMF  ¶34).     Though  the  affidavit's  jurat  resembles  an

---

[6] On August 26, 2009, CR Shannahan called Huszagh and reviewed Marino's August 11th letter, informing him of the affidavit request.  In addition, she copied Huszagh on her August 28, 2009 letter to Marino wherein she recounted what Marino requested in his August 2009 letter. Accordingly, State Farm told Huszagh verbally and in writing of the information Marino was seeking via affidavit (CSMF ¶¶24, 26).

acknowledgement jurat, the language in the affidavit clearly reflects that it is Huszagh's sworn statement as to the insurance available to him for the accident. His statement reflects that he had no other insurance, apart from the State Farm policy with $50,000 BI limits, which would provide coverage for his operation of his truck on March 20, 2009. Marino never complained about the form of Huszagh's affidavit while the underlying action was pending and never sought clarification from Huszagh as to his sworn statement.   Despite the best efforts of Coulter's underlying trial counsel, no evidence was discovered establishing that Huszagh had additional insurance coverage that could be used to pay for the losses he caused on March 20, 2009, while driving his truck.   State Farm's actions undertaken to assist Huszagh with the affidavit were in good faith and intended to facilitate, not interfere, with settlement.

Plaintiff contends State Farm acted in bad faith because the standard language in its proposed general release was deficient.   The standard release language released the insured and also any agents, assigns, employers, employees, firms and corporations.   With each of its policy limit tenders, State Farm enclosed its standard BI release for Coulter to consider.   Though all three (3) tenders were conditioned upon Coulter providing a release to Huszagh, none were conditioned on Coulter executing State Farm's standard release.   In fact, CR Shannahan sought assistance from Coulter and Marino in drafting an acceptable release and stated a willingness to consider a release drafted entirely by Marino. On two separate occasions, CR Shannahan asked Marino to provide the form of release he wanted to use but he failed to respond.   When, as here, Claimant's Counsel made no effort to negotiate the terms of the release then later foreclosed settlement, complaining that the insurer's standard general release language frustrated settlement, no reasonable person could infer that the insurer had acted in bad faith in its attempts to pay

18

limits to secure a release of its insured.  See Bankston v. Illinois National Ins. Co., Case No. 6:01-cv-278-Orl-21DAB at *10, footnote 15 (M.D. Fla. March 6, 2002), *aff'd* 54 Fed. Appx. 933 (11th Cir. Dec. 13, 2002) (unpublished) (granting summary judgment and noting the claimant's "attorney apparently made no effort to negotiate the terms of the release," and as such, one could infer that the "attorney was more interested in fabricating a potential bad faith claim than protecting his client's release rights"); see also Cardenas (granting insurer's summary judgment and finding no reasonable jury could conclude that insurer acted solely in its own best interest where claimant rejected tender because of some supposed defect in the release the insurer proposed).

Plaintiff contends State Farm acted in bad faith because its compliance with Marino's request for insurance information pursuant to F.S. §627.4137 was purportedly deficient. Specifically, Plaintiff contends State Farm failed to provide a certified copy of the at-issue policy and failed to provide "a declarations page that would allow [Coulter and Marino] to determine what coverages were afforded to Huszagh under the policy" (CSMF ¶36).  At the time, Florida's insurance disclosure statute required that an insurer provide within 30 days of its receipt of a written request by a claimant: (a) the name of all known insurers, (b) the name of each insured, (c) the limits of liability coverage, (d) a statement of any policy or coverage defense, and (e) a copy of the policy.  See Section 627.4137, Fla. Stat. (2009).  Prior to August 11, 2009, State Farm had provided Coutler's son with written confirmation of coverage available under the policy, disclosing BI limits of $50,000.  When State Farm received Marino's written request for insurance information and documentation pursuant to F.S. §627.4137, it immediately began collecting information to comply with that request.   On August 31, 2009, State Farm provided

the statement of one its claims managers, made under penalty of perjury, verifying the information required by statute and verifying that the attached policy was in effect on March 20, 2009.   State Farm produced a copy of the policy, which included the booklet form, the declarations page and the applicable endorsements.  Though the declarations page provided with the August 31, 2009 disclosure letter reflected a policy period from June 17, 2005 to February 4, 2006, which preceded the March 20, 2009 accident, it was the declarations page in effect on the date of the accident (CSMF ¶¶28, 29, 30, 31).

Contrary to Plaintiff's assertion, Florida's disclosure statute does not require an insurer provide a "certified copy" of the policy.  Furthermore, Marino never asked for a certified copy of the policy[7] nor conditioned acceptance of State Farm's policy limits on his receipt of a certified copy of the policy. State Farm was not required nor asked to provide a certified copy of the policy as a condition of settlement, and any failure to provide a certified copy of the policy prior to September 14, 2009, cannot rise to the level of bad faith.   See Cardenas.

In this litigation, Plaintiff argues Marino did not receive a declarations page and, alternatively, that the declarations page provided was not the declarations page for the at-issue policy because it reflected a policy period of June 17, 2005 to February 4, 2006.  As set forth in Team Manager Tim Scott's Declaration [Doc. 56], State Farm does not prepare a new declarations page each time the policy period renews unless there has been a material change in the policy, such as a new vehicle or different coverage limits. As to Huszagh's policy, there had been no material changes in his policy since the 2005-2006 period and, therefore, the declarations page enclosed with the August 31, 2009 letter applied to the March 20, 2009

---

[7] Marino asked Progressive, Coulter's insurer, for a certified copy of its policy but made no similar request of State Farm.

accident.  In accordance with its routine business practice, State Farm declared under penalty of perjury in its August 31, 2009 disclosure response that the policy and declarations page enclosed (even though it reflected an earlier renewal period) was the policy in effect on the date of the loss. If Marino needed or wanted clarification as to the coverage limits afforded under Huszagh's policy or confirmation that the correct declarations page had been provided so settlement could be finalized, he could have sought same.  At no time did State Farm indicate an unwillingness to discuss coverage or a refuse to provide information or answer questions.

Florida courts have recognized that the repeated refusal to disclose policy limits may constitute bad faith, as a refusal to inform a claimant of the liability limits deprives the claimant of a basis for evaluating the case.  See Powell 584 So.2d at 14 (insurer's refusal to respond to claimant's repeated requests for insurance information after being told of claimant's dire financial situation and insurer's delay in offering limits where liability is clear and injuries so serious that a judgment in excess of the policy limits is likely, was sufficient evidence of bad faith to take to the jury).  Florida law does not impose strict liability for bad faith on insurers who fail to timely or strictly comply with the requirements of Florida's disclosure statute.   Herein, unlike the insurer in Powell, State Farm repeatedly told Coulter of the BI limits available under Huszagh's policy, notifying her and her next-of-kin on six separate occasions that Huszagh had $50,000 in BI limits. The earliest notice was communicated just a few days after the accident. Additionally, State Farm timely provided insurance information to Marino in accordance with its routine business practice and in compliance with Florida's disclosure statute.

An insurer cannot force a claimant to accept its limits and it was within Coulter's prerogative to terminate settlement discussions at whim, which she did.   Her decision to

foreclose settlement discussions without negotiating acceptable release language or negotiating acceptable affidavit language shows State Farm was not afforded a realistic opportunity to settle and demonstrates Sate Farm was the only party making a good faith effort to resolve the claim for policy limits.  Coulter and her Counsel, through avoidance, frustrated settlement and deprived State Farm of a reasonable opportunity to settle.

The facts of this case do not justify converting Huszagh's $50,000 BI limits into unlimited insurance coverage.  Undeniably, State Farm evidenced an intent, from the beginning, to resolve Coulter's claims using its insured's policy limits,  [Exhibit D, Marino Deposition, p. 25:10-13], and acted in good faith toward and with due regard for its insured's interests in its efforts to resolve the claim against him.  Like the insurer in McGuire v. Nationwide Assurance Co., 2012 WL 712965 (M.D. Fla. 2012), State Farm stood ready to and did tender the full BI limits and attempted to satisfy  the claimant's  requests.  Additionally, State Farm kept its insured informed, among other matters, of Marino's August 11 letter and of the items requested.  The same result reached in McGuire, Cardenas, Barnard, Bankston, Keifer and DeLaune, i.e., a finding as a matter of law that the insurer did not act in bad faith and granting summary judgment in the insurer's favor, should be reached here as no rational juror could find State Farm put its interest above Huszagh's or that it failed to act in good faith.  When, as here, an insurer diligently investigates the claim, communicates with its insured, provides policy limits information to the claimant and attempts in good faith, albeit unsuccessfully, to settle the claim against its insured for the policy limits, summary judgment in the insurer's favor is warranted.

### Conclusion

In sum, no rational juror could conclude, given the totality of the circumstances, that State Farm acted in bad faith when it attempted for over six months to pay its policy limits to settle Coulter's claim against its insured. State Farm promptly and diligently investigated and evaluated Coulter's claim. State Farm early and often notified Coulter of the available BI limits, repeatedly tendered policy limits to her, and earnestly sought a release of its insured.   State Farm fulfilled its good faith obligations to advise its insured of settlement opportunities and of the probable outcome of litigation, to warn of the possibility of an excess judgment and to advise its insured of steps he may take to avoid same. The undisputed facts demonstrate State Farm did not unreasonably or wrongfully delay settlement nor seek to avoid settlement, and at no time did it act in its own self-interest and without due regard for its insured's interest. Plaintiff lacks sufficient evidence of bad faith conduct on the part of State Farm and, accordingly, State Farm is entitled to summary judgment in its favor.

WHEREFORE, Defendant State Farm Mutual Automobile Insurance Company respectfully seeks entry of final summary judgment in its favor.

**TAYLOR, DAY, GRIMM, BOYD & JOHNSON**

*/s/ Bradley R. Johnson*
Bradley R. Johnson, Trial Counsel
Florida Bar No. 0709425
brj@taylordaylaw.com
Carol M. Bishop
Florida Bar No. 0821357
cmb@taylordaylaw.com
50 N. Laura Street, Suite 3500
Jacksonville, FL  32202
(904) 356-0700 Telephone; (904) 356-3224 Facsimile
Attorneys for Defendant, State Farm Mutual
Automobile Insurance Company

23

**<u>Certificate of Service</u>**

I HEREBY CERTIFY that on the 14th day of June, 2013, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


*<u>/s/ Carol M. Bishop</u>*
Attorney