UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

EDITH COULTER, individually and
as assignee of VICTOR LEE HUSZAGH,

      Plaintiff,

v.                                                                     4:12cv577-WS/CAS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

      Defendant.

_____

## ORDER GRANTING STATE FARM'S MOTION FOR SUMMARY JUDGMENT

On March 20, 2009, Edith Coulter was seriously injured in an accident

caused by Victor Lee Huszagh.  At the time of the accident, Huszagh was insured

by State Farm Mutual Automobile Insurance Company ("State Farm").  In this

action, Coulter sues State Farm, alleging bad faith failure to settle Coulter's claim

against Huszagh.

Before the court at this time are the parties' cross-motions for summary

judgment.  Docs.  58 & 61.  For the reasons set forth below, the court finds that

State Farm is entitled to summary judgment.

## I.

This third-party action for common law bad faith stems from the underlying accident-related bodily injury ("BI") claim asserted by Coulter against State Farm's insured, Huszagh. Coulter was injured when Huszagh, driving a pick-up truck, turned into the path of Coulter, who was driving a motorcycle. Huszagh, an attorney, was insured under a State Farm automobile insurance policy with a $50,000 BI liability limit. He had no other insurance policies that would cover Coulter's injuries.

Huszagh reported the accident to his State Farm agent the evening of the accident. The next day, Saturday March 21, 2009, State Farm began its investigation of the accident. On Monday, March 23, 2009, Claim Representative Leslie Shannahan was assigned to handle the claim. That same day Shannahan interviewed Huszagh, explained his policy's BI limit, reviewed BI handling, advised him that she would be sending him an excess exposure letter, and suggested to him that he might want to consult an attorney of his choosing and at his own expense to discuss personal exposure beyond the policy limits. Shannahan also advised Huszagh that State Farm would likely be tendering the $50,000 policy limits once Coulter's injuries were confirmed. Shannahan memorialized her

conversation with Huszagh in a letter dated March 23, 2009, again stressing that Coulter's BI claim could exceed his policy limits.

Also on March 23, 2009, Shannahan spoke with Coulter's son, Bradley Coulter ("Bradley"), who reported that his mother was still in the hospital and needing surgery. Shannahan explained Huszagh's $50,000 liability limit, explained the health insurer's right to reimbursement against any settlement proceeds, and requested hospital admission and discharge records to confirm Coulter's injuries. Bradley asked Shannahan to confirm Huszagh's coverage limit in writing. Two days later, on March 25, 2009, Shannahan recorded in her Activity Log that Bradley left a voice mail asking that verification of Huszagh's BI liability limit be faxed to him at (850) 219-9704.

On March 25, 2009, in response to Bradley's request, Shannhan faxed a letter signed by Tim Scott, State Farm's Team Manager, confirming Huszagh's $50,000 liability coverage limit. A copy of Huszagh's policy was purportedly attached to Scott's letter. Whether the policy was, in fact, attached to the letter is disputed.

On March 26, 2009, just six days after the accident, Scott authorized Shannahan to tender the $50,000 BI limit to Coulter. By letter dated March 27, 2009, and mailed to Coulter on March 31, 2009, Shannahan tendered a draft (made

out to Coulter and Tallahassee Memorial Hospital) for the full BI policy limit of

$50,000.[1]  Shannahan enclosed a proposed BI release, explaining that "tender of

the policy limit is not conditioned upon this particular release, as it is only a

proposed release."  Shannahan invited Coulter to contact her with any questions.  A

copy of Shannahan's tender letter was sent to Huszagh.

On April 10, 2009, twenty-one days after the accident, Shannahan spoke

with Bradley about his mother's condition.  Bradley explained that his mother was

in a rehabilitation facility and was expected to remain there for another two to three

weeks.  On May 14, 2009, Shannahan again called Bradley, leaving a voice mail

asking for an update on his mother's condition and asking for a phone number

where his mother could be reached.

On June 3, 2009, having received no word from Coulter or Bradley about

State Farm's $50,000 check, Shannahan called the phone number listed for Edith

Coulter but learned that the number was not in service.  She next called Bradley

and left him a message, asking for Coulter's contact number.  That same day,

Shannahan wrote Coulter, asking Coulter to please contact her.

On June 9, 2009, an adjuster with Capital Health Plan ("CHP"), Coulter's

---

[1]  Coulter mistakenly believed that Tallahassee Memorial Hospital was a lien
hospital and, thus, a necessary co-payee.

health insurer, called Shannahan to advise her of CHP's lien and intent to

subrogate.  On June 12, 2009, Shannahan received CHP's written subrogation

notice.  That same day, Shannahan again attempted to reach Coulter by phone

without success.  She then sent Coulter a letter stating:

> I have been unable to reach you to discuss your accident.  I can see
> that you have not negotiated the $50,000 draft we issued payable to
> you and Tallahassee Memorial Hospital.  Since the time I issued the
> draft, we have been put on notice of Capital Health Plan's intent to
> subrogate.  Accordingly, I have stopped pay[ment] on draft number
> 11929928BJ.  Please destroy the draft and contact me to discuss
> further handling.

On July 14, 2009, having heard nothing from Coulter for almost four

months, Shannahan wrote to Coulter and sent another $50,000 check, representing

Huszagh's full $50,000 BI limit, to resolve Coulter's BI claim against Huszagh.

Shannahan stated in her letter:

> I previously provided a policy disclosure to you reflecting the bodily
> injury liability limit of $50,000 which pertains to this accident.
> Enclosed is our draft in the amount of $50,000 representing the per
> person bodily injury liability limit.  The draft is payable to Capital
> Health Plan and you.  Tallahassee Memorial Hospital did not file a
> lien against you; however, Capital Health Plan has paid benefits on
> your behalf.  Enclosed is a copy of the letter I received from Capital
> Health Plan regarding their subrogation.

Once again, Shannahan sent a copy of a proposed release and invited Coulter to

contact her with any questions.

During the months following the accident, Shannahan copied Huszagh with

all of the correspondence she sent to Coulter.  On August 4, 2009, Shannahan

advised Huszagh that no contact had been made with Coulter, no response from

Coulter had been received, and no notice of attorney representation had been

provided.  Shannahan explained that Coulter's phone had been disconnected but

mail had not been returned.

Coulter hired counsel, Stephen Marino, on April 24, 2009, but never advised

State Farm of that fact.  Indeed, Shannahan did not learn about Marino's

representation until August 26, 2009, when she received a letter dated August 11,

2009—sent by certified mail on August 12—from Marino, advising Shannahan

that he represented Coulter regarding her BI claim against Huszagh.[2]  In his letter,

Marino acknowledged Coulter's receipt of the two $50,000 checks, explaining that

he was returning them as "a housekeeping matter."  Marino's letter then went on to

state:

>   Although your July 14, 2009 letter indicates that State Farm
> previously provided documents to comply with Fla. Stat. § 627.4137,
> the documents that I have do not show full compliance.  It could just
> be that some documents didn't make it to my office, so I wanted to
> give you another opportunity to comply with the statute, and to give
> you the time provided within the statue [sic] to do so.

---

[2]  The record contains outgoing certified mail documentation that reflects
that the letter was mailed on August 12, 2009.  The record, however, does not
contain the letter's return receipt, documenting by whom and when State Farm
signed for the letter.

You have also previously indicated that you spoke on more than one occasion with Ms. Coulter's son, Bradley. . . . So that we can all keep our facts straight, please provide me with a written summary of the information you believe that you obtained from Bradley so that I can make sure that we are all on the same page.

Finally, it is my understanding that Mr. Huszagh is aware of the severity of Ms. Coulter's injuries, and that he left her a voicemail expressing his sympathies. Mr. Huszagh should therefore be amenable to executing an affidavit confirming that he has no additional insurance coverage that could be used to pay for the losses that he caused.

In addition to providing the items discussed above, please also provide me with the full policy benefits available under Mr. Huszagh's policy in a draft made payable to Edith Coulter and Ver Ploeg & Lumpkin, P.A. In exchange for all the items discussed, we will provide you and your insured with a general release that will not obligate my client to pay any damages suffered by State Farm or its client relating to this crash. Obviously, you can be assured that my firm will fulfill all of its obligations pursuant to the Florida Statutes with regard to valid liens asserted against Ms. Coulter relating to the crash.

With all these items in hand, we should shortly be able to put this matter to rest for both my client and your insured.

On August 26, 2009, the day she received Marino's letter, Shannahan directed Cindy Cannon, State Farm Customer Service Assistant, to obtain a copy of Huszagh's automobile insurance policy and declarations page. The next day, she called Marino's office to ask if he had an insurance affidavit he wanted Huszagh to use. When she was unable to reach him, she sent a letter to Marino—dated August 28, 2009—(1) providing a summary of the information she obtained from her

conversations with Bradley Coulter; (2) acknowledging that Marino wanted Huszagh to submit "an affidavit confirming that he has no additional insurance coverage that can be used to pay for the loss in this accident"; (3) asking Marino if he had an affidavit he wanted Huszagh to use; (4) enclosing a draft in the amount of $50,000, made payable to Edith Coulter and Marino's law firm as requested by Marino; and (5) advising that a complete policy disclosure would follow under separate cover.

On August 27, 2009, after Shannahan reviewed Marino's letter with Huszagh, Huszagh emailed Marino, advising Marino that he had no other insurance coverage apart from the State Farm policy with a $50,000 BI limit. Huszagh also informed Marino of his willingness to execute an affidavit to that effect.  Huszagh received no response to his email.

By letter dated August 28, 2009, Marino advised Shannahan that he "was preparing for a trial . . . scheduled to start on Monday, August 31, 2009, so a telephone conference is not likely to be possible in the near future."  He said he would respond to any written questions or information "as soon as I can."

By affidavit, Cindy Cannon asserts that, pursuant to Shannahan's BI disclosure request, she secured a copy of the policy booklet, policy endorsements, and declarations page that were in effect on March 20, 2009, the day of the

accident.  She also performed a search of State Farm's records regarding all umbrella or excess insurance known to State Farm at the time and found that no additional insurance existed for Huszagh.  On August 31, 2009, Cannon presented the applicable declarations page and policy booklet with endorsements, along with a disclosure letter, to Tim Scott.

By letter dated August 31, 2009, Tim Scott responded to Marino's disclosure request pursuant to Florida Statute 627.4137.  In his letter, signed under penalty of perjury, Scott identified Huszagh's automobile insurance policy, stated that Huszagh had $50,000 in BI liability coverage, and denied knowledge of any umbrella or excess insurance coverage.  Scott says he verified that copies of the applicable declarations page,[3] policy booklet, and endorsements were enclosed with his letter.  After signing the letter, Scott gave the letter and enclosures to Cindy Cannon for mailing.  Cannon declares that, after Scott reviewed the insurance disclosure materials and signed the disclosure letter on August 31, she collected the disclosure materials and letter from Scott, put them in an envelope,

---

[3]  According to Scott, State Farm does not prepare a new declarations page each time the policy period renews unless there has been a material change in the policy, such as a new vehicle or different coverage limits.  As to Huszagh's policy, there had been no material changes in his policy since the 2005-2006 period and, therefore, the 2005-2006 declarations page enclosed with the other policy documents in the August 31, 2009, letter applied to the March 20, 2009, accident.

and readied them for mailing to Marino.

According to Marino, Tim Scott's August 31 correspondence was received in his office on September 5, 2009.  By affidavit, Marino states that neither the declarations page nor the policy booklet were included in the mailing.

Marino advised Shannahan by letter dated September 4, 2009, that he found it "unusual that you would ask me to draft an affidavit for your insured to sign." Marino instead suggested that Huszagh "would be in the best position to provide the information needed and hopefully, with your help, will create and execute a document that will formalize his testimony under oath on the issue."

On September 8, 2009, Shannahan left a message for Jacksonville attorney Dwane Tyson (a State Farm claim litigation lawyer), asking for assistance in drafting an affidavit for Huszagh's use.  The next day, she discussed the matter with Tyson and faxed him Marino's letters regarding the request for an insurance affidavit.  On September 11, 2009, Tyson forwarded an "Affidavit of No Other Insurance" for Huszagh's use.  The affidavit stated: "With regard to this accident [dated March 20, 2009], there was no other insurance policy in effect at the time of the accident providing any coverage on said motor vehicle except as follows: State Farm Policy Number 5302-513-59 with Bodily Injury Liability Limits of $50,000." The language in Tyson's draft affidavit did not mirror Marino's request for an

affidavit stating that Huszagh had "no additional insurance coverage that could be used to pay for the losses that he caused."

Shannahan reviewed Marino's letter with Huszagh by phone on September 11, 2009. She faxed the proposed affidavit to Huszagh that same day with instructions to execute it "if all is correct," to mail the original to Marino, and to fax a copy to Shannahan. Huszagh executed the affidavit before a notary on September 11, 2009. Huszagh's secretary mailed the original to Marino on September 12, 2009, and faxed a copy to Shannahan.

By letter dated September 14, 2009, and received by State Farm on September 17, 2009, Marino returned State Farm's $50,000 check. He enclosed a copy of the complaint filed that day on Coulter's behalf against Huszagh, explaining that State Farm had failed to timely comply with the terms of Coulter's settlement offer. He asserted that State Farm failed to provide the requested affidavit, failed to provide a certified copy of Huszagh's insurance policy, and failed to include a declarations page "that would allow us to determine what coverages were afforded to Mr. Huszagh under the policy." According to Marino, State Farm had "frustrated" Coulter's goal of achieving a "prompt resolution" of her claim.

Marino received Huszagh's affidavit on September 15, 2009, one day after

suit was filed.  Marino maintains that Huszagh's affidavit was untimely because it was received in Marino's office more than thirty days after the settlement demand was sent to State Farm on August 12, 2009.  He also maintains that the form of the affidavit was unsatisfactory because it did not comply "with the wording or purpose of the request set forth in Coulter's settlement demand."

The underlying lawsuit resulted in a consent judgment in favor of Coulter in the amount of $2,000,000.  The lawsuit was defended by a lawyer retained by State Farm.

## II.

Under Florida common law, an insurer is obligated to exercise good faith when handling claims against its insured.  When defending its insured against a claim, the insurer "must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."  Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980).  "The essence of an insurance bad faith claim is that the insurer acted in its own best interests, failed to properly and promptly defend the claim, and thereby exposed the insurer to an excess judgment."  Goheagan v. American Vehicle Ins. Co., 107 So. 3d 433, 441 (Fla. 4th DCA 2012) (internal quotation marks omitted).

While evidence of carelessness may be relevant to proving bad faith, the "standards for determining liability in an excess judgment case is bad faith rather than negligence." Campbell v. Gov't Emp. Ins. Co., 306 So. 2d 525, 530 (Fla. 1974).

Whether an insurer acted in bad faith is generally a question for the jury to decide. Gutierrez, 386 So. 2d at 785. Florida courts, however, "regularly uphold summary judgments when the undisputed facts demonstrate that the insurer could not have acted in bad faith." Berges v. Infinity Ins. Co., 896 So. 2d 665, 687 (Fla. 2004) (citing cases).

Here, there is a complete absence of evidence that State Farm acted solely on the basis of its own interests as to Coulter's claim. Instead, the record demonstrates that State Farm promptly investigated the accident and diligently attempted in good faith to settle Coulter's claim for Huszagh's BI policy limit. Within three days of the accident, State Farm representatives had visited the scene of the accident, secured the police report, talked with Coulter's son, interviewed Huszagh, and explained available liability coverages to Huszagh. Huszagh was advised that Coulter's injuries were serious, warned about the possibility of an excess judgment, told that he might want to consult an attorney of his own choosing regarding his personal exposure, and informed that State Farm would be

seeking to settle the claim for Huszagh's $50,000 BI liability limit.  Shannahan thereafter apprised Huszagh about all steps taken to effect such a settlement.

Within six days of the accident, State Farm had authorized payment of Huszagh's $50,000 policy limit to settle Coulter's BI claim.  Eleven days after the accident, State Farm sent Coulter a $50,000 check along with a proposed release. Over the next four months, despite State Farm's multiple attempts to contact Coulter, Coulter neither returned State Farm's calls nor responded to its letters. She also did not negotiate the tendered check.

State Farm sent Coulter a second $50,000 check in mid-July, again with a proposed release.  One month later, Marino—who, unbeknownst to State Farm, had been retained to represent Coulter four months earlier—returned the tendered checks to State Farm by letter sent August 12, 2009.  Marino's letter represented the first communication that State Farm received from Coulter in the five months that had elapsed since the accident.

In his letter, which State Farm did not receive until August 26, Marino made four requests of State Farm: (1) full compliance with Florida Statute § 627.4137; (2) a written summary of the information that State Farm obtained from Bradley Coulter; (3) an affidavit confirming that Huszagh had no additional insurance coverage that could be used to pay for Coulter's losses; and (4) a check—made

payable to Coulter and Marino's law firm—for the full policy benefits available
under Huszagh's policy.  Marino did not set a deadline for acceptance of his
settlement demand.

Shannahan sent a written response to Marino's letter within two days of
receipt, summarizing her conversations with Bradley Coulter, asking for guidance
regarding the requested affidavit, advising that disclosure documents would be sent
under separate cover, and including a third check for $50,000 made out to Coulter
and Marino's law firm as requested by Marino.  Shannahan thus promptly
communicated—again—State Farm's willingness to settle Coulter's claim for
Huszagh's policy limit.  Just as promptly, Shannahan tasked the appropriate people
to (1) gather and send the disclosure documents required by Florida Statute §
627.4137; and (2) prepare, execute, and send the requested affidavit.

On September 14, 2009, one month after Marino sent his settlement demand
and two weeks after State Farm received it, Marino returned the third $50,000
check to State Farm and filed suit against Huszagh on Coulter's behalf, a suit that
ultimately resulted in a $2,000,000 consent judgment against Huszagh.  In this
ensuing action, Coulter contends that State Farm acted in bad faith in failing to
settle Coulter's claim.  In particular, Coulter contends that State Farm "frustrated"
Coulter's goal of achieving a "prompt resolution" of her claim by failing to timely

provide the disclosures required by Florida law and by failing to timely provide a

satisfactory affidavit of no other insurance.  The court is not persuaded by Coulter's

contentions.[4]

Regarding insurance disclosure documents, Florida law requires an insurer

to provide, within thirty days of a claimant's written request, "a statement under

oath, of a corporate officer . . . setting forth the following information with regard

to each known policy of insurance, including excess or umbrella insurance: (a) the

name of the insurer[;] (b) the name of each insured[;] (c) the limits of the liability

coverage[;] . . . [and] (e) a copy of the policy."  Fla. Stat. § 627.4137(a)–(c), (e).

Coulter asserts that State Farm failed to comply with subsection (e) of the statute

by failing to provide her with a complete copy of Huszagh's insurance policy prior

to the thirty-day deadline imposed by the statute.

For purposes of deciding the parties' summary judgment motions, the court

accepts Coulter's assertion that she did not receive a complete copy of Huszagh's

insurance policy within the requisite thirty-day period.  While the court accepts

such assertion, the court rejects the argument that an insurer's failure to strictly

_____

[4] Upon questioning at his deposition, Huszagh stated that he was satisfied
with the steps taken by State Farm in its efforts to settle Coulter's claim, and he
believed that State Farm acted at all times in his best interest.  Thus, in Huszagh's
opinion, State Farm did not act in bad faith.

comply with the disclosure statute necessarily constitutes an act of bad faith.  Here, given the record evidence of State Farm's diligent and timely efforts to pursue a settlement on behalf of Huszagh, it cannot reasonably be said that State Farm acted in bad faith simply because it failed to send—despite genuine and well-documented efforts to do so—a complete copy of Huszagh's policy within the requisite thirty-day period.

The court is likewise unpersuaded that State Farm evinced bad faith when it failed to provide Coulter with a satisfactory affidavit from Huszagh within thirty days of the date Marino sent his settlement demand.  In his demand letter, Marino did not identify a date by which he expected compliance with his settlement requests.  Coulter now suggests that State Farm should have known that the thirty-day period specified in § 627.4137 applied to her entire settlement demand. Section 627.4137, however,  provides a thirty-day deadline for providing certain listed disclosures; it does not otherwise set any deadlines.  State Farm can hardly be blamed for failing to recognize that Coulter would reject State Farm's efforts to settle based upon State Farm's failure to comply with an *unspecified* deadline.

Furthermore, upon receiving Marino's settlement demand, Shannahan took prompt action regarding Marino's request for an affidavit from Huszagh.  After discussing Marino's request with Huszagh (who, on his own initiative, emailed

Marino, stating that he had no other insurance apart from the State Farm policy), Shannahan attempted unsuccessfully to contact Marino to obtain his guidance regarding the wording of the requested affidavit.  Once she learned that Marino declined to provide such guidance, Shannahan immediately asked a State Farm lawyer for assistance in drafting an affidavit for Huszagh's signature.  Shannahan faxed the lawyer's draft affidavit to Huszagh as soon as she received it, instructing Huszagh to execute the affidavit "if all is correct" and to mail the original to Marino.  Huszagh did so without delay.  Under the circumstances, no reasonable juror could find that State Farm acted in bad faith with regard to Huszagh's affidavit.

Because the record does not support a finding that State Farm acted in bad faith, it is ORDERED:

1.  State Farm's motion for summary judgment (doc. 61) is GRANTED.

2.  Coulter's motion for summary judgment (doc. 58) is DENIED.

3.  State Farm's motion to strike (doc. 85) is DENIED.

4.  The clerk shall enter summary judgment stating: "Judgment is entered in State Farm's favor as to all claims."

DONE AND ORDERED this   16th   day of     January    , 2014.

s/ William Stafford
WILLIAM STAFFORD
SENIOR UNITED STATES DISTRICT JUDGE